DECISION
{¶ 1} Relator, Gene B. Lockhart, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying his application for permanent total disability compensation, and to enter a new order granting said compensation.
{¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that relator failed to establish that the commission had abused its discretion under R.C. 4123.53
when it ordered relator to submit to another examination following the March 20, 2001 hearing, and that this court should deny the requested writ.
{¶ 3} Relator filed an objection to the decision of the magistrate essentially rearguing issues already adequately addressed therein. For the reasons stated in the decision of the magistrate, the objection is overruled.
{¶ 4} Following independent review, pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained in it. In accordance with the decision of the magistrate, the requested writ is denied.
Objection overruled; writ denied.
PETREE and BROWN, JJ., concur.
APPENDIX A IN MANDAMUS
{¶ 5} In this original action, relator, Gene B. Lockhart, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying him permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
{¶ 6} 1. On February 2, 1985, relator sustained an industrial injury while employed as a "deli-manager" for respondent Cardinal Foods, Inc. The industrial claim is allowed for: "torn meniscus left knee; aggravation of pre-existing left knee degenerative joint disease; aggravation of pre-existing depression resulting in major depression," and is assigned claim number 85-55972.
{¶ 7} 2. On October 4, 2000, relator filed an application for PTD compensation. In support, relator submitted a questionnaire completed by Ann Snyder, M.D., on April 17, 2000. On the questionnaire, Dr. Snyder answered in the affirmative to the following question:
{¶ 8} "Is the claimant permanently and totally disabled as a result of this injury when taking into account his age, education and all other factors, such as physical and sociological that are known to you?"
{¶ 9} 3. In further support of his PTD application, relator submitted a questionnaire completed by his treating psychologist, T. Rodney Swearingen, Ph.D., on May 10, 2000. Dr. Swearingen answered in the affirmative to the following question:
{¶ 10} "Is the claimant permanently and totally disabled as a result of this injury when taking into account his age, education and all other factors, such as physical and sociological that are known to you?"
{¶ 11} 4. In a September 26, 2000 letter to relator's counsel, Dr. Swearingen stated:
{¶ 12} "* * * I have been treating him for 296.33 Major Depression. While he has experienced emotional ups and downs, I am supporting that he is now permanently and totally disabled. * * *"
{¶ 13} 5. On December 14, 2000, relator was examined by commission specialist R. Earl Bartley, M.D., an orthopedic surgeon. Dr. Bartley wrote:
{¶ 14} "PAST MEDICAL HISTORY: Significant for diabetes and coronary artery disease and a previous history of pneumonia. He is status post ORIF of left wrist following a fracture. He did have a right ankle fracture but this did not require surgery. He is status post cholecystectomy, vasectomy and heart catherization as well. * * * He uses a wheelchair and walker to ambulate. * * * He does perform very light household chores usually in the form of food preparation. He has significantly decreased standing and walking tolerance and utilizes the wheelchair constantly. He does drive with a limited driving tolerance of an hour or less and does require the assistance of a passenger to go with him. * * *
{¶ 15} "* * *
{¶ 16} "DISCUSSION: Claimant is status post injury to left knee 15 years ago with subsequent partial medial meniscectomy and chondroplasty. He has since developed an aggravation of his pre-existing joint disease. He is definitely a candidate for knee replacement following weight loss.
{¶ 17} "OPINION: * * * I do believe that the claimant has currently reached a level of maximum medical improvement unless he is able to affect significant weight loss.
{¶ 18} "* * * Based on AMA Guidelines, 4th Edition, I place his permanent partial impairment at 1% whole person lower extremity for partial medial meniscectomy and 2% whole person for patellofemoral crepitus. I did not have x-rays available to personally exam cartilage intervals at the knee. I do suspect that the impairment rating may be significantly higher however without the x-rays I cannot provide a higher impairment rating. These combine for a total of 3% for the left knee.
{¶ 19} "* * *
{¶ 20} "* * * I do not feel he can return to his former job as a deli manager due to the significant walking and standing.
{¶ 21} "* * * I do not feel he is capable of any job that would require him to work out of the home, I do feel he is possibly capable of sedentary work from a chair or wheelchair that would allow him to work from his residence. This should be a seated job and a wheelchair would allow him to go from a desk to a bookstand to retrieve items and communicate by phone. Otherwise I do not feel he is able to work out of his home."
{¶ 22} 6. Dr. Bartley also completed an Occupational Activity Assessment. This form asks the examining doctor to indicate by checkmark the claimant's capability in each of several occupational activities throughout the day. Dr. Bartley indicated that relator can sit for "5-8 HRS." However, he can stand only "0-3 HRS," and walk "[n]ot at all." Under the comment section of the form, Dr. Bartley wrote:
{¶ 23} "Pt must work seated in wheel chair, lifting carrying from wheel chair[.] Pt. must work from residence."
{¶ 24} 7. On December 15, 2000, relator was examined by commission specialist and psychiatrist Donald L. Brown, M.D. Dr. Brown wrote:
{¶ 25} "DISCUSSION:
{¶ 26} "* * * His major depression is in at least partial remission and I do not believe his depression alone would prevent him from returning to his former position of employment or other forms of sustained remunerative employment nor do I feel it is entirely a result of his injury allowed under this claim. It is probably more reflective of early traumatic events, possibly some genetic traits, and the effects of the automobile injury.
{¶ 27} "OPINION:
{¶ 28} "In my opinion, Mr. Lockhart has reached MMI with respect to his previously allowed aggravation of pre-existing depression resulting in major depression and can be considered permanent. Utilizing the Fourth Edition of the AMA Guides to the Determination of Permanent Impairment, I would rate him as having a Class III level of impairment with respect to his current overall depression and this corresponds with a moderate level of impairment. As noted, I do not believe it is all the result of the injury to his left knee which at [t]his point in time is not the most severe stressor in his life."
{¶ 29} 8. Dr. Brown also completed an Occupational Activity Assessment report. The form asks the examining psychiatrist the following two-part question:
{¶ 30} "Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/behavioral demands required:
{¶ 31} "[1.] To return to any former position of employment?
{¶ 32} "[2.] To perform any sustained remunerative employment?"
{¶ 33} Dr. Brown responded in the affirmative to each query.
{¶ 34} 9. The commission requested an Employability Assessment Report from John M. Bronish, a vocational expert. The Bronish report, dated January 29, 2001, responds to the following query:
{¶ 35} "Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, (A) immediately and/or (B) following appropriate academic remediation, or brief skill training."
{¶ 36} Bronish gave two employability opinions for the reports of Dr. Bartley. For Dr. Bartley's narrative report, Bronish found relator to be "[n]ot employable." For Dr. Bartley's occupational activity assessment report, Bronish listed the following "employment options" that can be performed immediately:
{¶ 37} "Assembly, Bench; Addresser, Mailing House; Information Clerk; Telephone Solicitor; Credit-Reference Clerk; Telephone Operator; Order Clerk, Food Beverage; Cashier II; Final Assembly, Optical Equipment."
{¶ 38} The Bronish report further states:
{¶ 39} "III. EFFECTS OF OTHER EMPLOYABILITY FACTORS
{¶ 40} "1) Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
{¶ 41} "Answer: Age: Writer does not view age to be valid determining factor for function.
{¶ 42} "Education: Claimant's 12th grade, High School educational accomplish-ment, in addition to his self-report of being able to read and write and perform basic math functions, is a positive educational profile regarding employability.
{¶ 43} "Work History: Claimant's self-reported, 26-year Work History was in a number of jobs that range concerning Specific Vocational Preparation from Level 2/Unskilled to Level 8/Skilled and that range concerning Strength Capacity from Sedentary to Heavy.
{¶ 44} "It is noted that claimant does not possess transferable skills that would fall within his Sedentary Residual Functional Capacity. Even the managerial types of positions would appear to this writer to be more job specific than anything else.
{¶ 45} "* * *
{¶ 46} "2. Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
{¶ 47} "Answer: Review of background data reveals that claimant is not only able to remediate, as he has achieved a High School education, but also would be able to engage in Short Term Training should that be required in order for him to re-enter the work force.
{¶ 48} "3. Question: Are there significant issues regarding potential employability limitations or strengths which you wish to call to the SHO's attention?
{¶ 49} "Answer: Claimant has not worked in about five years, since March of 1996. This recent, still current absence from the work force would be deemed a negative employability factor.
{¶ 50} "* * *
{¶ 51} "B. WORK HISTORY:
{¶ 52} "JOB TITLE * * * SKILL LEVEL STRENGTH DATES
{¶ 53} "Deli Cutter/Slicer * * * 2 Unskilled Light 80-96
{¶ 54} "Manager, Deli Dept * * * 7 Skilled Medium 80-96
{¶ 55} "Manager, Bakery * * * 8 Highly Skilled Sedentary 80-96 * * *"
{¶ 56} 10. Relator's PTD application was scheduled for hearing before a staff hearing officer ("SHO") on March 20, 2001. Following the hearing, the SHO issued an interlocutory order stating:
{¶ 57} "* * * [T]he claimant's application for permanent and total disability compen-sation filed 10/04/2000 is held in abeyance.
{¶ 58} "This claim file is referred to the Industrial Commission Medical Section to schedule the claimant for a new medical examination by the appropriate physical medicine medical specialist (and not Dr. Bartley) on the allowed physical conditions in this claim. This new examination and report is to replace the current reports of Dr. Bartley in the claim file.
{¶ 59} "Once the above newly ordered physical medicine medical specialist report is in file, this claim file is to be referred to Industrial Commission vocational expert Mr. Bronish for an addendum to his 01/29/2001 Employability Assessment Report in file. The addendum report is to include the findings of the above newly ordered physical medical specialist examination.
{¶ 60} "Once the above new medical specialist examination report and Employability Assessment Addendum report are in file, this claim is to be reset on the SHO Permanent Total Disability hearing docket on the issue of claimant's application for Permanent Total Disability filed 10/04/2000.
{¶ 61} "There is no need to schedule a new Industrial Commission Psychological Specialist report at this time. The 12/14/2000 reports of Dr. Donald L. Brown are sufficient to be considered on the issue of permanent and total disability compensation.
{¶ 62} "The Staff Hearing Officer orders the above new Industrial Commission physical medicine specialist examination and report on the allowed physical conditions based on the following: the 12/14/2000 reports of Dr. Bartley cannot be considered. The 12/14/2000 narrative report of Dr. Bartley contains work restrictions conclusions that are not consistent with the 12/14/2000 Occupational Activity Assessment form of Dr. Bartley. These differences are fatally inconsistent. This is demonstrated by the fact that vocational expert Mr. Bronish notes the various current employment options available to the claimant as a result of Dr. Bartley's Occupational Activity Assessment form; whereas there are apparently no current employment options available to the claimant based on Dr. Bartley's 12/14/2000 narrative report. This is because Dr. Bartley apparently opines in the 12/14/2000 narrative report that the claimant would not be able to work outside of his home.
{¶ 63} "The Staff Hearing Officer notes that the only physical conditions allowed in this claim relate to the claimant's left knee. It does not make sense that a left knee injury would restrict the claimant only to working from his home. Even injured workers who have suffered the complete amputation of their left leg (which the claimant has not) are not automatically physically restricted only to types of work that they can perform in their own house.
{¶ 64} "This is particularly true when the claimant admitted to Dr. Bartley that he can drive. In addition, the Staff Hearing Officer notes that the claimant walked into today's hearing.
{¶ 65} "The claimant testified at today's hearing that he told Dr. Bartley that the reason why he cannot leave his home to work; and the reason why he cannot remain in a seated position all day (note that the only physical conditions that the claim is allowed for are left knee conditions, which shouldn't cause any restrictions on sitting) is because of the claimant's sore back which occurred from a non-industrial auto accident. It appears that Dr. Bartley may have considered the non allowed and non-industrial low back conditions when he placed sitting restrictions on the claimant, and limited the claimant to working inside his home.
{¶ 66} "Based on the above, a new medical specialist examination and report based solely on the allowed left knee physical conditions in this claim is ordered. Further, that new medical specialist examination will need to be performed by someone other than Dr. Bartley."
{¶ 67} 11. On May 1, 2001, relator was examined by commission specialist and physiatrist, Timothy J. Fallon, M.D. Dr. Fallon wrote:
{¶ 68} "This gentleman has severe osteoarthritis of the knee on that left side. The claim has been allowed for an aggravation of a pre-existing degenerative joint disease of that left knee. He would require total joint replacement on that left side for treatment. The fact that he has not had the surgery up until this point in time and I am asked to evaluate him from his standpoint as he is at this point in time. His condition would be one which is stabilized and MMI. From the standpoint of the torn meniscus of the left knee and the degenerative joint disease, using the AMA Guides, Fourth Edition, this would represent a 20% whole person impairment.
{¶ 69} "This condition would not preclude this gentleman from continuing in his work activity. He would be able to have the surgery and return to his work activity. The fact that he was working up until 1996 would tend to substantiate the fact that this gentleman was able and is able to continue in his work activity. The reason he stopped in 1996 was associated with an inner ear problem and not because of the knee."
{¶ 70} 12. Dr. Fallon also completed a "physical strength rating" form on which he indicated that relator is capable of "light" work, as defined by Ohio Adm. Code 4121-3-34(B)(2)(b).
{¶ 71} 13. On May 25, 2001, Mr. Bronish issued an addendum to his January 29, 2001 report. Based upon Dr. Fallon's reports, Bronish listed immediate employment options as follows:
{¶ 72} "* * * Former Job Position: Deli Cutter/Slicer
{¶ 73} "Other Job Positions: Same as Sedentary jobs listed [for Dr. Bartley].
{¶ 74} "Additional Light jobs would be: Record Clerk; Mail Clerk; Waiter; Counter Clerk; Watch Guard; Usher; File Clerk."
{¶ 75} 14. Following a June 27, 2001 hearing, the SHO issued an order denying relator's PTD application. The SHO's order of June 27, 2001 states:
{¶ 76} "The Staff Hearing Officer relies upon the persuasive reports dated 05/02/2001 that were prepared by Industrial Commission Physical Medicine Specialist Dr. Fallon. The Doctor supports the conclusion that the allowed physical conditions do not prevent the claimant from engaging in at least certain types of sustained remunerative employment, including jobs previously successfully performed by the claimant at the time that he last worked in 1996. The Staff Hearing Officer notes that the jobs performed by the claimant when he last worked in 1996 included Bakery Manager; Deli Manager; and Deli Cutter/Slicer. These former jobs performed by the claimant are all listed as being sedentary or light level jobs, per the 01/29/2001 and 05/25/2000 reports of Industrial Commission Vocational Expert Mr. Bronish. The above reports of Dr. Fallon support the conclusion that the allowed conditions do not physically prevent the claimant from performing work within the sedentary and light physical ranges.
{¶ 77} "The Staff Hearing Officer relies upon the persuasive reports dated 02/14/2000 that were prepared by Industrial Commission Psychiatric Specialist Dr. Brown. He supports the conclusion that the allowed psychological conditions do not prevent the claimant from engaging in sustained remunerative employment, including the claimant's former positions of employment.
{¶ 78} "Where the medical evidence on which the Commission is relying supports a conclusion that the claimant can return to former positions of employment there is no need to consider or discuss the non-medical disability factors. State, ex rel. Speelman v. Indus. Comm. (1992), 73 O.App.3d 757; State, ex rel. Libbey-Owens Ford Co. v. Indus. Comm. (1991), 62 Ohio St.3d 6; State, ex rel. Hartung v. Indus. Comm. (1990), 53 Ohio St.3d 257; State, ex rel. Stephenson v. Indus. Comm. (1987), 31 Ohio St.3d 167. Since it is the finding of the Staff Hearing Officer that the above persuasive medical reports support the conclusion that the allowed conditions do not prevent the claimant from returning to work similar to jobs previously successfully performed by the claimant, there is no need to consider the claimant's non-medical disability factors.
{¶ 79} "Based on a careful consideration of the above, as well as all of the evidence in file and at hearing, the Staff Hearing Officer concludes that the claimant is capable of performing sustained remunerative employment consistent with jobs previously successfully performed by the claimant. Therefore the claimant is not Permanently Totally Disabled."
{¶ 80} 15. On February 20, 2001, relator, Gene B. Lockhart, filed this mandamus action.
Conclusions of Law:
{¶ 81} The issue is whether the commission abused its discretion under R.C. 4123.53 when it ordered relator to submit to another examination following the March 20, 2001 hearing.
{¶ 82} Finding that the commission did not abuse its discretion, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
{¶ 83} R.C. 4123.53(A) states in part:
{¶ 84} "* * * [T]he industrial commission may require any employee claiming the right to receive compensation to submit to a medical examination * * * at any time, and from time to time, at a place reasonably convenient for the employee[.] * * *"
{¶ 85} The only case addressing the limits of the commission's discretion to order a claimant examined is State ex rel. Clark v. Indus. Comm. (1997), 78 Ohio St.3d 509, a case heavily relied upon by relator. Thus, a review of the Clark case is instructive.
{¶ 86} In Clark, the claimant ("Clark") had sustained two industrial injuries. The claims were allowed for multiple physical conditions and for some psychological conditions. Following the filing of her PTD application in April 1988, the commission had Clark examined by an orthopedist, Dr. Braunlin, and by a psychiatrist, Dr. Nims. Dr. Braunlin reported that Clark was unable to perform her previous work, but she could perform sedentary work. Although Dr. Nims reported that Clark's psychiatric impairments represent a low degree (24 percent), he felt that her combined impairments would prevent all sustained remunerative employment.
{¶ 87} In July 1989, the commission ordered Clark to report for another round of medical examinations, this time with Clarance Louis, M.D., and Giovanni Bonds, Ph.D. Dr. Louis reported that Clark cannot return to her former position of employment, but with rehabilitation could return to sedentary work. Dr. Bonds reported that the psychological conditions prohibit Clark from engaging in sustained remunerative employment and render her not psychologically stable enough to participate in rehabilitation services.
{¶ 88} In February 1992, combined-effects reviewer Merle Gibson, M.D., concluded that Clark suffers a 40 percent combined-effects impairment and is psychologically unable to engage in sustained remunerative employment.
{¶ 89} In June 1992, Clark's application was heard by the commission. However, the commission decided to hold Clark's application in abeyance pending yet another psychological examination to be followed by another combined-effects review, after which the claim would be returned to the commission for an order without further hearing.
{¶ 90} In September 1992, Clark was examined by clinical psychologist Jill Shaffer, Ph.D., who concluded that the industrial injury itself does not prevent Clark from returning to her former position of employment. Thereafter, a combined-effects review was performed by Walter Holbrook, M.D., who concluded that Clark was capable of performing sustained remunerative employment. Dr. Holbrook essentially imposed a work restriction of light duty with the additional caveat that Clark cannot perform occupations requiring close association with others or with the general public.
{¶ 91} In August 1993, the commission, without further hearing, issued an order finding that Clark was not permanently and totally disabled. The order was based particularly upon the reports of Drs. Louis, Shaffer and Holbrook.
{¶ 92} Thereafter, Clark filed in this court a mandamus action contending that the commission had abused its discretion by ordering another examination and combined-effects review after the June 1992 hearing. This court found that the commission did not abuse its discretion in ordering the examination and review after the June 1992 hearing, but did find that the commission's order violated State ex rel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203. Clark appealed to the Supreme Court of Ohio.
{¶ 93} After noting that R.C. 4123.53 gives the commission broad discretion with regard to requiring a claimant to submit to medical examinations, the Supreme Court in Clark stated:
{¶ 94} "The commission's discretion under former R.C. 4123.53, however, is not unlimited. While former R.C. 4123.53 imposes no specific limit on the number of medical examinations that the commission may schedule, on any given issue, neither does it permit the commission to act in an unreasonable, arbitrary or unconscionable fashion in its determination to schedule them. Propriety, not aggregation, is the polestar of discretion in this case. Indeed, the very concept of discretion connotes action taken in light of reason, and bounded by the rules and principles of law. * * *
{¶ 95} "Accordingly, we hold that the commission abuses its discretion under former R.C. 4123.53 where the record fails to disclose that additional medical examinations are necessary or of assistance in determining PTD." Id. at 512-513.
{¶ 96} In Clark, the commission claimed that the additional psychological examination by Dr. Shaffer was necessary because Dr. Bonds "`addressed a non-allowed psychological condition in his report. Thus, his report could not be used as evidence in this matter.'" Id. at 513. The Clark court, however, found that Dr. Bonds did not address a nonallowed psychological condition in his report or take into account anything other than Clark's allowed psychological injuries in rendering his opinion.
{¶ 97} Several other arguments put forth by the commission to justify the additional examinations after the June 1992 hearing were rejected by the Supreme Court.
{¶ 98} The Clark court concluded that the reports of Drs. Shaffer and Holbrook must be stricken from evidentiary consideration because the commission abused its discretion in ordering the additional examination and review. Finding that all the remaining evidence indicates that Clark is psychologically unable to engage in any sustained remunerative employment or participate in any rehabilitative program, the court, pursuant to State ex rel. Gay v. Mihm (1994), 68 Ohio St.3d 315, ordered the commission to enter a finding that Clark is permanently and totally disabled.
{¶ 99} Here, the commission's interlocutory order of March 20, 2001 sets forth three reasons for ordering a new medical examination: (1) Dr. Bartley's narrative report is "fatally inconsistent" with his occupational activity assessment report; (2) that it does not make sense that a left knee injury would restrict relator to work performed at his home; and (3) that Dr. Bartley improperly considered a nonallowed low back condition in rendering his work-at-home restrictions.
{¶ 100} Because the commission's second reason for rejecting Dr. Bartley's report clearly justified another medical examination, the magistrate concludes that the record here discloses that the additional medical examination performed by Dr. Fallon was necessary or of assistance in determining the merits of the PTD application.
{¶ 101} The pertinent part of the commission's March 20, 2001 interlocutory order bears repeating:
{¶ 102} "The Staff Hearing Officer notes that the only physical conditions allowed in this claim relate to the claimant's left knee. It does not make sense that a left knee injury would restrict the claimant only to working from his home. Even injured workers who have suffered the complete amputation of their left leg (which the claimant has not) are not automatically physically restricted only to types of work that they can perform in their own house.
{¶ 103} "This is particularly true when the claimant admitted to Dr. Bartley that he can drive. In addition, the Staff Hearing Officer notes that the claimant walked into today's hearing."
{¶ 104} The above quoted portion of the commission's interlocutory order succinctly explains the basic credibility problem with Dr. Bartley's report. How can a left knee injury, even one as serious as in this case, restrict relator to work at home when relator admittedly drives a car and walked into the hearing room? Dr. Bartley's reports fail to answer or address this obvious and important question. Moreover, in this action, relator fails to address why he feels that this reason, articulated by the commission in its order, is not sound.
{¶ 105} If indeed it makes no sense that a left knee injury would restrict relator to working at his home, then the commission can properly inquire into why Dr. Bartley would have reached this opinion. Taking into account nonallowed conditions would tend to explain how Dr. Bartley reached this unsound conclusion, even though Dr. Bartley never directly indicates that he considered nonallowed conditions.
{¶ 106} Regardless of whether it can be argued by relator that it is mere speculation to conclude that Dr. Bartley improperly considered a nonallowed low back condition, it is clear from Dr. Bartley's report that the work-at-home restriction raises obvious questions that are unanswered. Where a key question is left unanswered, the commission is entitled to conclude that the medical report's persuasiveness is either diminished or rejected. State ex rel. Pavis v. Gen. Motors Corp., B.O.C. Group (1992), 65 Ohio St.3d 30.
{¶ 107} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.